IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA


| | | |
|---|---|---|
| AMERICAN HEARTLAND PORT, INC., | ) | |
| JO LYNN KRAINA, SHELLEY REED, | ) | |
| and MISTY SHANNON, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. 5:11-CV-50 |
| | ) | Judge Stamp |
| AMERICAN PORT HOLDINGS, INC., | ) | |
| a Delaware corporation, DANIEL L. | ) | |
| DICKERSON, ANDREW S. FELLOWS, | ) | |
| STANLEY BALLAS, JAMES MARTODAM, | ) | |
| and JAMES C. BRECKINRIDGE, individually, | ) | |
| PATRICK NICHOLAS DICARLO, an | ) | |
| individual, CHANNEL POINT PARTNERS, | ) | |
| a corporation, ALLIED INVESTMENT | ) | |
| PARTNERS PJSC, a Foreign corporation; and | ) | |
| ARCELORMITTAL WEIRTON, LLC, | ) | |
| a corporation. | ) | |
| | ) | |
| Defendants. | ) | |


**MEMORANDUM IN SUPPORT OF DEFENDANT
ARCELORMITTAL WEIRTON, LLC'S MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ....................................................................................... 1

II.    FACTS ....................................................................................................... 2

III.   ARGUMENT ............................................................................................. 6

     A.     Motion For Summary Judgment Standard ............................................ 6

     B.     ArcelorMittal Is Entitled to Summary Judgment on Plaintiffs' Intentional Interference Claim ................................................................ 7

            1.    Plaintiffs' Intentional Interference Claim is Premised Entirely On Unsupported Conjecture and Speculation ..................................... 7

            2.    ArcelorMittal Did Not Sell Its Property To APH Because APH Never Obtained Financing To Buy The Property ...................................... 9

            3.    The Purchase Agreement Was Never Assigned ..................................... 11

            4.    ArcelorMittal's Actions Were Not The Proximate Cause Of The Settlement's Failure .......................................................................... 12

     C.     Summary Judgment Also Should Be Entered on Plaintiffs' Claim That ArcelorMittal Aided and Abetted APH's Alleged Fraudulent Conveyance of the Purchase Agreement ................................................................... 14

            1.    APH Never Assigned Its Rights Under the Purchase Agreement .......... 16

            2.    In Any Event, There Is No Claim for Aiding and Abetting a Fraudulent Transfer ......................................................................... 17

     D.     Alternatively, Plaintiffs' Damages Are Limited to the Amount of Plaintiffs' Contingent Settlement with APH ........................................ 18

IV.   CONCLUSION ....................................................................................... 20

## I.      INTRODUCTION

ArcelorMittal Weirton, LLC ("ArcelorMittal") entered into an Agreement of Purchase and Sale ("Purchase Agreement") with defendant, American Port Holdings, Inc., ("APH") to sell APH ArcelorMittal's Weirton property.  APH defaulted by failing to raise the funds to close on the purchase.  Despite this default, Plaintiffs conditionally settled its claims against APH, Daniel Dickerson, Andrew Fellows, James Martodam, and Stanley Ballas (the "Original Defendants")[1] by agreeing that APH would pay a sum of money to the three individual Plaintiffs if APH could still purchase the ArcelorMittal property and if the parties could then agree on a payment schedule.  If either condition was not satisfied, there would be no settlement.

ArcelorMittal was prepared to sell the property to APH.  It deposited a deed and other closing documents into escrow as required by the Purchase Agreement, and kept the Purchase Agreement in effect for an extended period despite the requirement that APH close within 120 days.  ArcelorMittal even assisted APH's attempts to obtain financing.  APH, however, could not raise the required funding and ArcelorMittal eventually terminated the Purchase Agreement several months after APH defaulted by failing to close.  As a result – and also because there was no agreement on a payment schedule – there was no settlement.

At the time they settled, Plaintiffs knew that APH had received a notice of default and a notice of failure to cure the defaults from ArcelorMittal.  In presenting their "settlement" to the Court, Plaintiffs' counsel explained to the Court, that "… as best we can tell – both sides, I think agree [the purchase]– is somewhat in trouble".  Thus, Plaintiffs were fully aware the settlement monies might not be paid because a) APH was having difficulty raising the money to purchase

---

[1] In 2011, Plaintiffs filed this case against the Original Defendants for breach of fiduciary duty, misappropriating corporate opportunity and other claims arising from the Original Defendants' activities to develop a port on the property owned by ArcelorMittal in Weirton.

the property, b) the parties had different views on when the settlement monies would be paid, and c) even if it purchased the property, APH might not have the money to pay the settlement amount to Plaintiffs.

Plaintiffs' caution proved to be well founded.   APH still was unable to secure the financing to purchase the property and Plaintiffs were not paid the settlement monies.  Rather than accept the consequences of their decision, however, Plaintiffs seek to hold ArcelorMittal liable for the failed settlement by claiming that ArcelorMittal somehow interfered with the settlement by not selling the property to APH and that ArcelorMittal aided and abetted APH in fraudulently conveying the purchase agreement to a third party.  Plaintiffs, however, lack any evidence to support their clams, relying instead on unsupported and inadmissible conjecture. Instead, the undisputed evidence contradicts Plaintiffs' claims.  ArcelorMittal did not sell the property to APH because, as APH freely admits, it never obtained financing.  Nor did any conveyance of the purchase agreement, much less a fraudulent one, occur.  ArcelorMittal is entitled to summary judgment as there are no genuine issues of material fact to be tried.

## II.    FACTS[2]

In 2009, APH, which was comprised of some of the former members of the Plaintiff American Heartland Port ("AHP") group that had previously expressed interest in buying the ArcelorMittal Weirton property, approached ArcelorMittal about purchasing that property. ArcelorMittal negotiated with APH for an extended period of time.  During the negotiations, Plaintiffs filed this lawsuit against the Original Defendants (which includes APH) alleging that

---

[2] Most of the exhibits cited by ArcelorMittal in this memorandum have been designated as confidential or highly confidential or contain information so designated under the terms of one or more of the protective orders entered in this case and only can be filed under seal.  Thus, the exhibits to this memorandum, with leave of court, will be filed under seal.  ArcelorMittal will file a motion to file these exhibits under seal.

they misappropriated corporate assets and committed fraud by forming a new company to attempt to buy the ArcelorMittal property and develop a port there without Plaintiffs. [Compl., dkt. 1].

On May 29, 2012, ArcelorMittal entered into the Purchase Agreement with APH to sell the property to APH. [Exh. 1, Purchase Agreement]. The Purchase Agreement required that a closing on the sale occur within 120 days of the date of the Purchase Agreement, unless extended by agreement, and that time was of the essence. [Exh. 1, Purchase Agreement, paras. 10, 16]. APH was required to deposit the cash portion of the purchase price in escrow at least one day before the closing. [Exh. 1, Purchase Agreement, paras. 11, 12]. ArcelorMittal had the right to terminate the Purchase Agreement if APH defaulted and failed to cure the default within ten days of notice from ArcelorMittal. [Exh. 1, Purchase Agreement, para. 18].

An escrow was set up and ArcelorMittal deposited with the escrow agent the property deed and other documents to effectuate the sale to APH. [Exh. 2, ArcelorMittal dep. at 182]. ArcelorMittal stood ready to close on the sale of the property to APH if APH could secure the necessary funds. [Exh. 3, Breckenridge dep at 212-13; Exh. 2, ArcelorMittal dep at 93, 182]. APH, however, was never able to obtain financing to purchase the property. [Exh. 5, APH resp. to req. to adm., nos. 2, 8, 11-14].

ArcelorMittal served a notice of default on APH on October 10, 2012 and requested APH to cure its defaults by depositing the purchase price monies in escrow. [Exh. 6, Oct. 10, 2012 notice of default]. APH failed to cure its default. [Exh. 3, Breckenridge dep at 211; Exh. 5, APH resp. to req. to adm., nos. 2, 8, 11-14]. On October 24, 2012, ArcelorMittal served a notice of failure to cure on APH. [Exh. 7, Oct. 24, 2012 notice of default; Exh. 3, Breckenridge dep at 204-05]. APH still did not cure the defaults identified in ArcelorMittal's notice. *Id.* APH's

default and failure to cure gave ArcelorMittal the right to terminate the Purchase Agreement. [Exh. 3, Breckenridge dep at 205-06; Exh. 1, Purchase Agreement, para. 18].

Despite APH's default and failure to cure, on October 29, 2012, Plaintiffs and the Original Defendants tentatively agreed to postpone the trial to give APH even more time to try to obtain financing to purchase the ArcelorMittal property.  If APH somehow managed to do so this time, Plaintiffs and Original Defendants would then try to negotiate a schedule by which APH would pay the individual Plaintiffs an agreed upon sum of money.  [Exh. 8, Oct. 29, 2012 email]. Thus, *if* APH purchased the ArcelorMittal property, *if* the Original Defendants obtained the additional  funds to pay Plaintiffs, and *if* Plaintiffs and Original Defendants agreed to a payment schedule, the parties would exchange releases and dismiss the case.  [Exh. 9, AHP dep at 20-34; Exh. 8, Oct. 29, 2012 email].  If those contingencies did not come to pass, however, there would be no settlement, the litigation would proceed and the settlement amount would not be admissible. *Id.*

Thus, although Plaintiffs call it a "settlement", it was contingent on APH obtaining acquisition financing, closing on its purchase of the ArcelorMittal property, obtaining the necessary money to pay the settlement and reaching agreement with Plaintiffs on a payment schedule.  No written settlement agreement was executed.  [Exh. 9, AHP dep at 6-13].  Rather, the only documentation is an email from Original Defendants' counsel to Plaintiffs' counsel. [Exh. 9, AHP dep at 6-13].

Plaintiffs' and the Original Defendants' counsel appeared in Court on October 29 to advise the Court of the terms that had been negotiated to that point, and ask the Court to postpone the trial to give APH an opportunity to obtain financing, buy the ArcelorMittal property and then try to negotiate an agreement with Plaintiffs on a settlement payment schedule.

[Exh. 10, Oct. 29, 2012 trans.].  Both counsel explained the tentative and contingent nature of the agreement.  Counsel for Plaintiffs made it clear, not only that any settlement was contingent on APH purchasing the property, but that its ability to do so remained uncertain.  Plaintiffs' counsel explained that "[b]ut the project, as best we can tell . . . is somewhat in trouble . . . ." and that APH "recently received a letter from ArcelorMittal Steel that they are in default of the real estate contract."  [Exh. 10, Oct. 29 trans., pp. 2, 3].  Plaintiffs' counsel advised the Court that ". . . if they're [APH] not in a position to pay it off, we have left open the possibility of negotiating terms for the payment of that [settlement amount], provided, however, that if we can't agree on those terms, then the [settlement amount] is back off the table, just as if the real estate thing never closed, and we proceed to trial . . . ."  [Exh. 10, Oct. 29 trans., p. 4].

In the meantime, ArcelorMittal did not yet terminate the Purchase Agreement, even though it had a right to do so.  [Exh. 3, Breckenridge dep at 205-207].  ArcelorMittal even referred APH to a possible source of financing.  [Exh. 4, Papajcik dep at 23-26].  In December 2012, ArcelorMittal met with APH to discuss resolution of APH's defaults.  [Exh. 2, ArcelorMittal dep at 97-100].  ArcelorMittal proposed to not terminate the Purchase Agreement if APH would deposit $1 million as earnest money into the escrow towards the purchase by January 1, 2013.  [Exh. 4, Papajcik dep at 45-47; Exh. 2, ArcelorMittal dep at 79-80].  APH failed to raise the $1 million.  [Exh. 3, Breckenridge dep at 21].

After waiting several months for APH to obtain financing and three months after the requisite closing date ArcelorMittal, rather than terminate the contract, suggested APH try to assign the Purchase Agreement to a potential assignee, AIP.  ArcelorMittal suggested the assignment as a way for APH to remain involved in the deal in some capacity and perhaps as a way for APH to negotiate a deal to pay its creditors.  [Exh. 2, ArcelorMittal dep at 105-106, 115-

116; Exh. 4, Papajcik dep at 61-64].  As stated by James Breckenridge of APH, "[i]t left us with a foot in the door in that we were not terminated at that time, which ArcelorMittal had the right to do after we failed.  We defaulted."  [Exh. 3, Breckenridge dep at 20-21]  Otherwise, ArcelorMittal would have to terminate the Purchase Agreement which would leave APH with nothing.  *Id.*

On January 18, 2013, ArcelorMittal and APH signed a consent to assign whereby ArcelorMittal consented to APH assigning the Purchase Agreement to a third party.  [Exh. 11, Consent to Assignment; Exh. 2, ArcelorMittal dep at 176-81].  However, no assignment of the Purchase Agreement was made because APH and AIP were unable to agree to the terms of an assignment.  [Exh. 2, ArcelorMittal dep at 176-181; Exh. 3, Breckenridge dep at 209-10].

On May 21, 2013, after almost four years of negotiations with APH, a year after the Purchase Agreement was signed, and seven months after APH failed to deposit the purchase price in escrow, ArcelorMittal terminated the Purchase Agreement.  [Exh. 13, May 21, 2013 termination].  At that point, APH was insolvent, with several million dollars in debt.  [Exh. 14, Dickerson dep at 17].   Since the termination of the Purchase Agreement with APH, ArcelorMittal has negotiated with other parties to sell the property, but has not entered into a purchase agreement to sell it.  [Exh. 2, ArcelorMittal dep at 143-146].

## III.    ARGUMENT

### A.    Motion For Summary Judgment Standard.

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Charbonnages de France v. Smith,* 597 F. 2d 406, 414 (4th Cir. 1979).  Rule 56 mandates the entry of summary judgment against a party who fails to make a showing sufficient

6

to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). The party opposing summary judgment must demonstrate that a triable issue of fact exists; he may not rest upon mere allegations or denials. *Id.* "In such a situation, there can be 'no genuine issue as to any material fact,' since a… failure of proof concerning an essential element of the nonmoving party's case renders all other facts immaterial." *Id.* at 323. "The standard for granting summary judgment mirrors the standard for a directed verdict under Federal Rule of Civil Procedure 50(a)." *Id.* (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986)). "[T]his standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson*, 477 U.S. at 247-48. Disputes of irrelevant or unnecessary facts will not be counted. *Id.* at 248. "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff. The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict." *Id.* at 252.

**B.**    **ArcelorMittal Is Entitled to Summary Judgment on Plaintiffs' Intentional Interference Claim.**

   **1.**    **Plaintiffs' Intentional Interference Claim is Premised Entirely On Unsupported Conjecture and Speculation.**

In Count VIII, Plaintiffs allege:

> After the tentative settlement of October 29, Defendants DiCarlo, the AIP Defendants, and AM colluded with each other in interfering with Plaintiff's [sic] prospective advantage, business relationship or expectancy with respect to a tentative settlement by dealing among themselves and to the exclusion of counsel for Defendants APH, to cause APH to give up all of its right and

7

> interest in the AM property contract to the benefit of DiCarlo and
> other buyers more acceptable to AIP, …

[Am. Compl., para. 101, dkt. 229].  Plaintiffs have no evidence to support this allegation.

Indeed, discovery has proven this allegation to be wholly unsupported and wrong.   In

interrogatories, ArcelorMittal asked Plaintiffs for the factual basis for Plaintiffs' intentional

interference allegations.   Plaintiffs offer no factual support, but merely recite inadmissible

conjecture.  [Exh. 12, Plaintiffs' ans. to inter., nos. 4, 5 and 6].  Plaintiffs speculate that

ArcelorMittal "pressured" Patrick DiCarlo, who was working with APH to obtain financing, to

persuade APH to sign the consent to assign the Purchase Agreement, and that by doing so, APH

could not purchase the property and satisfy the condition to effectuating its settlement with

Plaintiffs.  Even if this was intentional interference, Plaintiffs have no evidence to support this

conjecture.  ArcelorMittal consented to an APH assignment (which never occurred) as a means

to try to keep APH involved in the deal even after APH had defaulted and as an alternative to

ArcelorMittal terminating the Purchase Agreement.  [Exh. 4, Papajcik dep at 61-64; Exh. 2,

ArcelorMittal dep at 105-106, 115-116].

Plaintiffs' interrogatory answers identify Patrick DiCarlo, Dale Papajcik, Keith Nagle and

Terrence Allen as the witnesses who will testify with respect to the claims against ArcelorMittal.

Patrick DiCarlo, Dale Papajcik, and Keith Nagle's deposition testimony, as cited in this

memorandum, do not support and only refute Plaintiffs' claims.[3]  [Exh. 12, Plaintiffs' ans. to

interr., no. 12].   Plaintiffs cannot "create a genuine issue of material fact through mere

speculation or the building of one inference upon another."  *Beale v. Hardy*, 769 F.2d 213, 214

(4th Cir. 1985); *see also Francis v. Booz, Allen & Hamilton, Inc.*, 452 F.3d 299, 308 (4th Cir.

---

[3] Terrence Allen has not been deposed and does not reside in the United States.

8

2006) ("Mere unsupported speculation is not sufficient to defeat a summary judgment motion if the undisputed evidence indicates that the other party should win as a matter of law.").

### 2. ArcelorMittal Did Not Sell Its Property To APH Because APH Never Obtained Financing To Buy The Property.

Under West Virginia law, to establish a claim for tortious interference, the plaintiff must prove: "(1) [the] existence of a contractual or business relationship or expectancy; (2) an intentional act of interference by a party outside that relationship or expectancy; (3) proof that the interference caused the harm sustained; and (4) damages." *C.W. Dev., Inc. v. Structures, Inc. of West Virginia,* 185 W. Va. 462, 465, 408 S.E.2d 41, 44 (1991); *Hatfield v. Health Mgmt. Assocs. of West Virginia, Inc.*, 223 W.Va. 259, 267, 672 S.E.2d 395, 403 (2008). "Tortious interference requires a purposeful wrongful act without justification or excuse." *Water Eng'g Consultants, Inc. v. Allied Corp.,* 674 F. Supp. 1221, 1225 (S.D. W. Va. 1987).

*Thus, Plaintiffs' intentional interference claim requires evidence that ArcelorMittal wrongfully refused to sell the property to APH without justification or excuse in order to purposely interfere with the settlement.* There is no evidence of this. The undisputed evidence is to the contrary. The Purchase Agreement was entered into on May 29, 2012 and required a closing within 120 days. ArcelorMittal deposited its closing documents into escrow. [Exh. 2, ArcelorMittal dep at 182]. These closing documents were only removed by ArcelorMittal after it terminated the Purchase Agreement on May 21, 2013. [Exh. 2, ArcelorMittal dep at 182]. To purchase the property, APH merely had to deposit the cash component of the purchase price into the escrow and the sale would have closed. Even APH's in-house counsel agreed that it was his "… understanding that if APH had come up with the money, that ArcelorMittal would have been prepared to go ahead and proceed with the transaction." [Exh. 3, Breckenridge dep at 213].

9

APH admitted, however, that, a) it did not obtain financing and could not satisfy its payment obligations under the Purchase Agreement, b) it did not deposit the cash component of the purchase price with the escrow agent, c) it had breached the financial obligations under the Purchase Agreement as of October 29, 2012 (the date of the tentative settlement), and d) ArcelorMittal had the right to terminate the Purchase Agreement after October 29, 2012. [Exh. 5, APH resp. to req. to admit, nos. 2, 8, 11-14]. ArcelorMittal did not sell the property to APH only because APH "did not deposit the funds into escrow to acquire the property." [Exh. 2, ArcelorMittal dep at 182]. The tentative settlement did not have anything to do with the willingness of ArcelorMittal to sell the property to APH. [Exh. 2, ArcelorMittal dep at 183].

As further evidence that ArcelorMittal did not act wrongfully, ArcelorMittal even tried to assist APH in obtaining financing by referring APH to a party to whom ArcelorMittal previously has sold property, to potentially provide financing for APH's purchase of the property. [Exh. 4, Papajcik dep at 22-24]. Even lead Plaintiff, Jo Lynn Kraina, agrees that she would not expect ArcelorMittal to give its property to APH without being paid for it. [Exh. 15, Kraina dep at 48]. Yet, applying Plaintiffs' theory, ArcelorMittal only could have avoided Plaintiffs' claim for intentional interference by giving the property to APH. There is no evidence to support Plaintiffs' claims that ArcelorMittal engaged in purposefully wrongful acts without justification or excuse to interfere with the settlement. ArcelorMittal simply did not sell the property to a would-be buyer who did not have the funds to buy it.

"Even those defendants who have interfered with another's interests are justified or privileged to do so when factors that show the interference was proper." *Hatfield*, 223 W.Va. at 267, 672 S.E.2d at 403. An actor does not commit tortious interference by "asserting a bona fide claim" or who asserts "in good faith a legally protected interest of his own . . . if the actor

believes that his interest may otherwise be impaired or destroyed by the performance of the contract or transaction."  Restatement (Second) of Torts § 773.  Nor is there liability "where the breach is caused by the exercise of an absolute right . . . Absolute rights include rights incident to the ownership of property [and] rights growing out of contractual relations . . . The exercise of an absolute right or privilege protects one from liability only if the right exercised is equal or superior to the right invaded."  44B Am. Jur. 2d Interference § 22.  Thus, it is not "unjustifiable interference" to enforce or comply with "one's own valid contract," or to exercise a legal right to terminate an agreement to which the actor is a party.  *Id.*; *see also, Shenoy v. Charlotte-Mecklenburg Hosp. Auth.*, 521 F. App'x 168, 173 (4th Cir. 2013) (finding that a hospital's choice to exercise its legal right under a contract to request that a contractor terminate one of its employees "is not tortious conduct" interfering with the employee's employment rights) (applying North Carolina law, but citing 45 Am. Jur. 2d Interference § 23); *Thompson Everett, Inc. v. Nat'l Cable Adver., L.P.*, 57 F.3d 1317, 1327 (4th Cir. 1995) (finding that exercise of exclusivity provisions under contracts to the exclusion of the plaintiff were good faith assertions of legally protected contractual interests and therefore non-actionable under Section 773 of the Restatement) (applying Virginia law).

Thus, even if ArcelorMittal's actions somehow constituted tortious interference – and for a myriad of reasons they did not – Plaintiffs' claim still would fail.  ArcelorMittal had an absolute right to protect its own contract and property rights.

### 3.   The Purchase Agreement Was Never Assigned.

Plaintiffs intentional interference claim is premised on a theory that ArcelorMittal persuaded Patrick DiCarlo, who was working to obtain financing for APH, to convince APH to assign its rights under the Purchase Agreement to a third party, AIP, and that this assignment

precluded APH's purchase of the property. [Am. Compl., para.101, dkt. 229]. APH, however, never assigned its rights under the Purchase Agreement. [Exh. 5, APH resp. to req. adm., no. 23]. The consent to assign that was signed by ArcelorMittal was not an assignment and in no way affected APH's right to buy the property. The sole premise of Plaintiffs' intentional interference claim is unsupported and wrong.

### 4. ArcelorMittal's Actions Were Not The Proximate Cause Of The Settlement's Failure.

Intentional interference claims require proof that the interference proximately caused the harm sustained and damages. *C.W. Dev.,* 185 W. Va. at 465, 408 S.E.2d at 44. Thus, Plaintiffs must prove that but for ArcelorMittal's interference, APH would have, a) secured financing and purchased the property, b) reached agreement with Plaintiffs on payment terms, and c) secured the additional funds to pay Plaintiffs. *See Hinckle Oil & Gas, Inc. v. Bowles Rice McDavid Graff & Love, LLP,* 360 F App'x 400 (4th Cir. 2010); *Bocook Outdoor Media, Inc. v. Summey Outdoor Adver., Inc.,* 294 S.C. 169, 178, 363 S.E.2d 390, 394 (S.C. Ct. App. 1987) ("[P]laintiff must show that, but for the interference, the contractual relationship would have continued") *overruled on other grounds by O'Neal v. Bowles*, 314 S.C. 525, 431 S.E.2d 555 (1993); *Smith v. Citizens and Southern National* Bank, 241 S.C. 285, 128 S.E.2d 112, 114 (S.C. 1962). West Virginia law defines proximate cause to mean "that cause which in actual sequence, unbroken by any independent cause, produced the wrong complained of, without which the wrong would not have occurred." *Spencer v. McClure*, 217 W. Va. 442, 446, 618 S.E.2d 451, 455 (2005) (citation and internal quotations omitted).

The settlement monies were not paid to the individual Plaintiffs – not because ArcelorMittal somehow interfered with a settlement – but because APH could not raise the funds necessary to purchase the property, something that Plaintiffs understood was a real possibility.

ArcelorMittal played no role in the failure of the individual Plaintiffs to receive any settlement monies.

Moreover, there is no evidence that Plaintiffs would have reached agreement with APH regarding when the settlement amount would be paid (even assuming APH could purchase the property and then secure additional funds to pay the settlement).  If the parties could not reach agreement on a payment plan, the settlement would be off.  [Exh. 8, Oct. 29, 2012 email; Exh. 10, Oct. 29, 2012 tran. at 4].  Lead Plaintiff Jo Lynn Kraina's testimony reinforces the inability of the individual Plaintiffs and Original Defendants to agree on the payment terms.  She first testified that Original Defendants were required to pay the settlement amount by April 29, 2013, which differs from what Original Defendants' counsel wrote in his confirming email to Plaintiffs' counsel:

> Q.    Well, can you tell me what your understanding of the settlement was?
>
> A.    The original Defendants were to pay the [settlement amount] on or before April 29th when we were to have a status hearing before Judge Stamp. … And if they didn't pay by that date, we'd go to trial; or if we couldn't agree to a payment amount, we go to trial, and that number disappears forever.

Exh. 15, Kraina dep at 13].

> Q.    Was it your understanding they're required to fund the settlement by that six-month period?
>
> A.    Yes.   But this is a contingent agreement, so it was hindering [sic] on contingencies.

[Exh. 15, Kraina dep at 17].

In the AHP Rule 30(b)(6) deposition, Ms. Kraina then acknowledged the lack of any agreement, testifying:

> Q.     Were there any discussions, to your knowledge, between Plaintiffs and Defendants – and whether it's by yourself and the defendants or your counsel and the defendants' counsel – as to what the payment terms would be that you're aware of?
>
> …
>
> A.     We discussed that they would pay it – because we were graciously granting the delay, granting them to settle at such a low amount, that they would pay it in full by April 29 of last year, 2012 – '13.  Or if they had to do it in payments, it would be in less than three months.
>
> Q.     Did they ever agree to that?
>
> A.     Not that I know of.  As far as I know, we never heard back.

[Exh. 9, AHP dep at 18-19].

Clearly, no payment plan was ever agreed to.  Nor do Plaintiffs have any evidence that even if APH had obtained financing to purchase the property that APH – which had accumulated several million dollars in debt and had no assets of any significant value – would have then secured the additional funds to pay the individual Plaintiffs the settlement amount.  [Exh. 14, Dickerson dep at 17].  Absent evidence that these parties would have agreed to a payment plan and that APH would have had the settlement monies to pay Plaintiffs, Plaintiffs' tortious interference claim is pure speculation.

**C.     Summary Judgment Also Should Be Entered on Plaintiffs' Claim That ArcelorMittal Aided and Abetted APH's Alleged Fraudulent Conveyance of the Purchase Agreement.**

In Count X, Plaintiffs allege that the Original Defendants entered into a Consent to Assign and Release their rights under the Purchase Agreement, without receiving reasonably equivalent value, thereby fraudulently hindering Plaintiffs with respect to their claim against APH in connection with the lawsuit and the contingent, partial settlement agreement.  Plaintiffs claim that APH's Consent to Assign was a violation of the West Virginia Uniform Fraudulent

14

Transfer Act, W. Va. Code § 40-1A-1, *et. al.*, ("WVUFTA"), and that ArcelorMittal aided and assisted the alleged fraudulent transfer.[4]

As a threshold matter, Plaintiffs had no right to payment from the Original Defendants under an undocumented, contingent, partial "settlement". *Cabot Oil & Gas Corp. v. Daugherty Petroleum, Inc.*, 479 F. App'x 524, 528 (4th Cir. 2012) (Courts "must be careful not to construe correspondence as constituting a binding agreement if the parties intended for [the correspondence] to serve merely as preliminary negotiations."); *Ridgeway Coal Co., Inc. v. FMC Corp.*, 616 F. Supp. 404, 407 (S.D. W. Va. 1985) (holding that even though the plaintiff satisfied all of the conditions in a preliminary correspondence about a land lease, the correspondence was "nothing more than an agreement to negotiate").

In any event, even assuming Plaintiffs were creditors of the Original Defendants for purposes of the WVUFTA[5] , judgment still should be entered in favor of ArcelorMittal on this Count for two independent reasons.  First, APH never assigned its rights under the Purchase Agreement to any assignee.   Indeed, APH did not transfer any property right.   Rather, ArcelorMittal terminated the Purchase Agreement because APH could not raise the money to buy the property.  Second, even if APH had conveyed some interest it had in the property and even if the conveyance would have been without reasonably equivalent value, Plaintiffs still

---

[4] Under the WVUFTA, a transfer is fraudulent as to present and future creditors where the debtor makes the transfer either: (i) "with actual intent to hinder, delay or defraud" a creditor; or (ii) "without receiving a reasonably equivalent value in exchange" and the debtor is likely to become insolvent.  Transfers are fraudulent as to present creditors where the debtor does not receive reasonably equivalent value in exchange and the debtor was either insolvent at the time of the transfer or became insolvent because of the transfer. W.Va. Code §§ 40-1A-1-5.

[5] Under the UVWFTA, A  "creditor" is a person who has a "claim," which is a right to payment. W.Va. Code § 40-1A-1(c)-(d).

would not prevail against ArcelorMittal because West Virginia does not recognize a claim for aiding and abetting a fraudulent transfer.

### 1.      APH Never Assigned Its Rights Under the Purchase Agreement.

ArcelorMittal, in agreeing to allow APH to assign its rights under the Purchase Agreement, was not trying to push APH out of the deal.  To the contrary, the effort was to see whether anything could be done to keep APH involved or enable it to secure some benefit rather than terminate the contract outright as ArcelorMittal had a right to do given APH's ongoing defaults.  Regardless, APH and ArcelorMittal merely signed an agreement that would authorize APH to try to negotiate another agreement to assign its rights under the Purchase Agreement to an assignee.  But that never occurred.  Simply put, APH never conveyed the property rights that form the basis for Plaintiffs' fraudulent conveyance claim in Count X.

In the end, ArcelorMittal had no choice but to terminate the Purchase Agreement due to APH's ongoing defaults.   At that point, APH's equitable interest in the property was extinguished and APH possessed no rights to transfer.  *In re Wey*, 854 F.2d 196, 199 (7th Cir. 1988) ("[W]hen a termination is pursuant to the terms of a contract, there is no transfer."); *In re McGhee*, No. 99-2019, 2000 WL 33950115, at *3 (Bankr. S.D. Ga. Apr. 28, 2000) (debtor's failure to close on the purchase of a home by the specified closing date was a default on the purchase agreement, extinguishing the purchaser's equitable interest in the property). ArcelorMittal was not required to give its property away.  Its attempt to obtain payment for its property – and to simply consider the possibility that a defaulting purchaser assign its rights to an assignee – does not remotely support a fraudulent conveyance claim.

**2.      In Any Event, There Is No Claim for Aiding and Abetting a Fraudulent Transfer.**

Even if APH had conveyed some property interest, and even if the conveyance was fraudulent, Plaintiffs' claim would still fail because West Virginia does not recognize a cause of action for aiding and abetting a violation of the WVUFTA.   West Virginia adopted the WVUFTA in 1986 with the intent to "protect unsecured creditors against debtors who make transfers out of, or make obligations against, the debtor's estate in a manner adverse to the creditor's rights."  *Nicholas Loan & Mortg., Inc. v. W.Va. Coal Co-Op, Inc.*, 209 W.Va. 296, 300, 547 S.E.2d 234, 238 (2001). Thus, the WVUFTA's primary remedy is "[a]voidance of the transfer or obligation to the extent necessary to satisfy the creditor's claim." W.Va. Code § 40-1A-7(a)(1). The other remedies are addressed to the debtor or the transferee. W.Va. Code §§ 40-1A-7 and 40-1A-8.

ArcelorMittal, however, is neither the assignor or the assignee of APH's rights under the Purchase Agreement.  The WVUFTA provides no rights to creditors against parties alleged to have aided or abetted a fraudulent transfer.  Other courts have considered and rejected this argument. *See, e.g., Magten Asset Mgmt. Corp. v. Paul Hastings Janofsky & Walker LLP*, No. 04-cv-1256, 2007 WL 129003, at *3 (D. Del. Jan. 12, 2007) ("[Under the UFTA] liability cannot be imposed on non-transferees under aiding and abetting or conspiracy theories."); *Ernst & Young LLP v. Baker O'Neal Holdings, Inc.*, No. 1:03-cv-0132, 2004 WL 771230, at *14 (S.D. Ind. Mar. 24, 2004) ("[T]he Florida Supreme Court . . . recently joined the multitude of other courts in holding that there is no accessory liability for fraudulent transfers under the Uniform Fraudulent Transfer Act."); *Freeman v. First Union Nat'l Bank*, 865 So.2d 1272, 1277 (Fla. 2004) ("[The UFTA] was not intended to serve as a vehicle by which a creditor may bring a suit against a non-transferee party . . . for monetary damages arising from the non-transferee party's

17

alleged aiding-abetting of a fraudulent money transfer."); *Amoco Chem. Co. v. Tex Tin Corp.*, 925 F. Supp. 1192, 1203 and n. 12 (S.D. Tex. 1996) ("The UFTA does not create liability against . . . a third party to the transaction. Nor would such a scheme make sense, given that the guiding principle of the UFTA is that, as to creditors, property fraudulently transferred, or its proceeds, continues in the debtor and, therefore, is subject to the demands of creditors." ); *Mann v. GTCR Golder Rauner, L.L.C.*, 483 F.Supp.2d 884, 919 (D. Ariz. 2007) (rejecting theory of aiding and abetting liability under the UFTA and noting that the theory is "limited to those who aid and abet 'tortfeasors' [and] does not apply to those who aid and abet statutory violations such as the []UFTA").

The WVUFTA – which was intended to be construed in a manner similar to that of other states adopting the Uniform Fraudulent Transfer Act – likewise should be construed to preclude third party liability. Indeed, the West Virginia Legislature specifically provided that the WVUFTA "shall be applied and construed to effectuate its general purpose to make uniform the law with respect to the subject of this article among states enacting it." W.Va. Code § 40-1A-11. For this reason as well, summary judgment should be entered in ArcelorMittal's favor on Count X.

**D.    Alternatively, Plaintiffs' Damages Are Limited to the Amount of Plaintiffs' Contingent Settlement with APH.**

For the reasons explained above, this Court should enter summary judgment in favor of ArcelorMittal on Counts VIII and X.  Alternatively, this Court should enter partial summary judgment in favor of ArcelorMittal ruling that Plaintiffs' maximum recovery against ArcelorMittal cannot exceed the amount that Plaintiffs were to be paid pursuant to the tentative,

conditional settlement with the Original Defendants.   This should be obvious.[6]   After all, Plaintiffs only sued ArcelorMittal after the failure of the "settlement", alleging that ArcelorMittal was responsible for that failure and for the individual Plaintiffs not receiving the settlement money they hoped to receive.   Plaintiffs do not blame ArcelorMittal for their exclusion from the port project that is the subject of their claim against the Original Defendants.   Because both of Plaintiffs' claims against ArcelorMittal are premised solely on the failure of the settlement, the only potential damages proximately resulting from that failure is the settlement payment that Plaintiffs believe they would have received from that settlement, not all of the damages flowing from Plaintiffs' failed port development business plan.   "[T]he only harm an intentional interference claim is intended to redress is the solicited party's failure to perform its contractual obligations and that the only damages recoverable are those resulting from that failure to perform."   *Am. Select Ins. Co. v. Allegheny Ins. Servs., Inc.*, No. 11-CV-49, 2012 WL 1109135, at *10 (N.D. W.V. Apr. 2, 2012).   Indeed, Plaintiffs' Amended Complaint alleges, "[a]s a result of Defendants tortious interference with the tentative settlement agreement, Plaintiffs' *lost the expectancy of receiving said settlement monies*, and were otherwise damaged as hereinafter more fully set out."   [Am. Compl., para. 102; dkt. 229 (emphasis added)].   Plaintiffs' Amended Complaint does not allege any other damages.

Accordingly, while this Court should enter summary judgment in favor of ArcelorMittal, alternatively, ArcelorMittal requests this Court to enter partial summary judgment in its favor limiting Plaintiffs recovery from ArcelorMittal to the amount of Plaintiffs' tentative, conditional settlement with the Original Defendants.

---

[6] ArcelorMittal's counsel discussed this issue with Plaintiffs' counsel and requested Plaintiffs' counsel to stipulate that Plaintiffs' damage claim is the settlement monies that Plaintiffs were to be paid had the settlement been consummated.   Plaintiffs' counsel declined.

## IV.  CONCLUSION

Two undisputed facts, as well as established principles of law, require the entry of judgment in favor of ArcelorMittal on Counts VIII and X:  (1) APH never assigned its rights under the Purchase Agreement and (2) the only reason ArcelorMittal did not sell its property to APH was because APH was unable to obtain the funds necessary to buy the property.  Plaintiffs' claims against ArcelorMittal are meritless under the facts, the law and common sense.  Summary Judgment should be granted in favor of ArcelorMittal.

Dated:  April 16, 2014        Respectfully submitted,


/s/ Jeffrey A. Kimble
Jeffrey A. Kimble (W. Va. Bar #4928)
(jak@ramlaw.com)
E. Ryan Kennedy
(erk@ramlaw.com)
Robinson & McElwee PLLC
140 West Main Street, Suite 300
Clarksburg, West Virginia  26302-0128
Telephone: (304) 326-5314
Facsimile: (304) 622-5065


Pro Hac Vice Counsel

Dennis Powers (IL Bar #6186463)
dennis.powers@dlapiper.com
Kenneth Schmetterer (IL Bar #6201860)
kenneth.schmetterer@dlapiper.com
DLA Piper LLP (US)
203 North LaSalle St., Suite 1900
Chicago, Illinois 60601
Telephone: (312) 368-7273/2176
Facsimile: (312) 630-5372/6350


*Counsel for ArcelorMittal Weirton, LLC*

20