IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

AMERICAN HEARTLAND PORT, INC.,
JO LYNN KRAINA, SHELLEY REED
and MISTY SHANNON,

     Plaintiffs,

v.                          Civil Action No. 5:11CV50
                                    (STAMP)

AMERICAN PORT HOLDINGS, INC.,
a Delaware corporation,
DANIEL L. DICKERSON, ANDREW S. FELLOWS,
STANLEY BALLAS, JAMES MARTODAM and
JAMES C. BRECKINRIDGE, individually,
PATRICK NICHOLAS DICARLO, an individual,
CHANNEL POINT PARTNERS, a corporation,
ALLIED INVESTMENT PARTNERS PJSC,
a foreign corporation and
ARCELORMITTAL WEIRTON, LLC, a corporation,

     Defendants.


**MEMORANDUM OPINION AND ORDER
CONFIRMING THE PRONOUNCED ORDER OF THIS COURT
GRANTING ORIGINAL DEFENDANTS' MOTION
FOR PARTIAL SUMMARY JUDGMENT AND
GRANTING ARCELORMITTAL WEIRTON, LLC'S
MOTION FOR SUMMARY JUDGMENT**


I.   Procedural History

The plaintiffs, American Heartland Port, Inc. ("American Heartland"), Jo Lynn Kraina ("Kraina"), Shelley Reed ("Reed"), and Misty Shannon, brought their original complaint against defendants Daniel Dickerson, Andrew S. Fellows, Stanley Ballas,[1] James

----

[1]The plaintiffs, by counsel, at the pretrial conference held in this matter, stated that they were abandoning all claims against original defendant Stanley Ballas. Accordingly, all references below to the original defendants include only Daniel Dickerson, Andrew S. Fellows, James Martodam, James C. Breckinridge, and American Port Holdings.

Martodam, James C. Breckinridge, and American Port Holdings (hereinafter "original defendants") on the basis of diversity jurisdiction pursuant to 28 U.S.C. § 1332. In their complaint, the plaintiffs allege claims of fraud and misrepresentation, breach of contract, equitable estoppel, misappropriation of corporate assets, unjust enrichment, breach of fiduciary duties as to all individually named defendants, legal malpractice and breach of fiduciary duty by defendant James Breckinridge, and interference with business opportunities and prospective advantage. As relief, the plaintiffs sought compensatory damages in excess of $75,000.00, disgorgement of any unjust enrichment, punitive damages, and attorney's fees.

On the day before trial was set to begin concerning the plaintiffs' original complaint, the parties notified this Court that they had reached a tentative settlement, and requested that the case be stayed for six months due to uncertainties concerning the settlement. Therefore, after a hearing concerning this notification, the Court entered an order staying the proceedings until April 29, 2013.

On April 3, 2013, the plaintiffs filed a motion seeking this Court's acknowledgment that the tentative settlement was withdrawn and void as of April 29, 2013, and requesting that this Court require the defendants to supplement discovery and provide the plaintiffs with a report concerning the status of the settlement.

This Court, after holding a status conference concerning the plaintiffs' motion, directed the parties to meet and confer about a possible discovery plan and protective order regarding discovery. The parties then submitted a proposed 60-day discovery plan and stipulated protective order, which this Court approved.

After the expiration of the discovery plan, this Court held a status and scheduling conference. During this conference, the plaintiffs indicated that they may file a motion to amend the complaint based on what they discovered during the 60-day discovery plan. After the conference, this Court entered an amended scheduling order, which allowed for additional time for the plaintiffs to submit a motion to amend the complaint. The plaintiffs submitted their motion to amend on September 10, 2013. Through this motion, the plaintiffs sought to add additional parties[2] and additional claims to their original complaint.

As a result of certain orders entered by this Court and notices of dismissal entered by the parties, the following counts remained part of this action: (1) Count I, plaintiffs' claim for fraud and misrepresentation against the original defendants; (2) Count II, plaintiffs' breach of contract claim against the original

_____

[2]The plaintiffs in their amended complaint added Patrick DiCarlo, Channel Point Partners, Allied Investment Partners PJSC, ArcelorMittal, and Dale Papajcik as additional parties. Based on the plaintiffs' notices of dismissal either in writing or made at hearings on this matter and based on various rulings made by this Court, the only additional defendant that remains subject to any counts in this action is ArcelorMittal.

defendants; (3) Count III, plaintiffs' equitable estoppel claim against the original defendants; (4) Count VI, plaintiff's claim for breach of fiduciary duties against the original defendants; (5) Count VII, plaintiffs' claim for legal malpractice and breach of fiduciary duty against original defendant James Breckinridge; (6) Count VIII, plaintiffs' claim for tortious interference with plaintiffs' business opportunities and prospective advantage against the original defendants[3] and ArcelorMittal; (7) Count IX, plaintiffs' claim for violation of the doctrine of good faith and fair dealing in working with others to sabotage the settlement agreement against the original defendants and ArcelorMittal; (8) Count X, plaintiffs' claim under the West Virginia Uniform Fraudulent Transfers Act ("WVUFTA") (W. Va. Code § 40-1A-4) and/or under a theory of accomplice liability against the original defendants and ArcelorMittal; and (9) Count XI, plaintiffs' claim for breach of the duty of loyalty against the original defendants.

Upon completion of discovery, the original defendants filed a partial motion for summary judgment and ArcelorMittal filed a motion for summary judgment as to all counts against it. In the original defendants' partial motion for summary judgment, they seek summary judgment as to Counts IX, X, and XI. First, the original

---

[3]The plaintiffs, by counsel, stated at the pretrial conference held on June 16, 2014, that they were abandoning all additional claims in their amended complaint against original defendant James Martodam. Thus, it is this Court's understanding that Martodam is no longer a named defendant in Counts VIII, IX, X, and XI.

defendants argue that Rule 408 of the Federal Rules of Evidence precludes evidence of settlement negotiations, thereby precluding Counts IX, X, and XI of plaintiffs' amended complaint from proceeding to trial. Second, the original defendants argue that Count IX fails as a matter of law because West Virginia does not provide for such a cause of action. Third, the original defendants assert that Count X fails as a matter of law because plaintiffs are not creditors of the original defendants. Fourth, the original defendants assert that Count XI fails as a matter of law because the original defendants owed no duty of loyalty to plaintiffs with respect to any tentative settlement, and because the claim is nothing more than plaintiffs' breach of fiduciary duty claim in Count VI.

ArcelorMittal filed a summary judgment motion seeking the dismissal of all counts asserted against it. First, ArcelorMittal argues that summary judgment must be granted as to Count VIII, plaintiffs' claim for tortious interference, because it is based entirely on unsupported conjecture and speculation. Further, ArcelorMittal argues that Count VIII must also be dismissed because ArcelorMittal did not sell its property to the original defendants because they never obtained financing to buy the property, the purchase agreement was never assigned, and ArcelorMittal's actions were not the proximate cause the settlement's failure. Second, as to Count X, ArcelorMittal argues that this count must be dismissed

as to it because the original defendants never assigned their rights under the purchase agreement, and even so West Virginia does not recognize a cause of action for aiding and abetting a violation of the WVUFTA. Third, ArcelorMittal argues that in the alternative, plaintiffs' damages are limited to the amount of plaintiffs' contingent settlement with the original defendants.

The plaintiffs filed an omnibus response to the summary judgment motions. First, they argue that the settlement agreement created an enforceable expectancy, which was subverted by defendants' breach of their duty of good faith and fair dealing. Second, they assert that ArcelorMittal has tortuously interfered with this contingent settlement agreement. Third, the plaintiffs argue that the original defendants may be held liable for a claim of fraudulent conveyance under the WVUFTA and ArcelorMittal can be found liable under the doctrine of accomplice liability. Fourth, the plaintiffs assert that damages against ArcelorMittal are not limited to the amount of the contingent settlement with American Port Holdings. Fifth, the plaintiffs assert that there are genuine issues of material fact and this Court may consider the evidence they presented in considering whether a genuine issue of material fact exists.

The defendants filed timely replies, and this Court then scheduled oral argument concerning the motions for summary

judgment.[4] Following the oral argument, this Court issued a letter setting forth its tentative findings as to both the original defendants' partial motion for summary judgment and ArcelorMittal's motion for summary judgment. The letter indicated that this Court granted both motions. This order confirms those rulings in more detail for the reasons set forth below.

## II. Facts[5]

In September 2008, Kraina was employed as a consultant for Tantara Communications, LLC ("Tantara"). At that time, Tantara was interested in providing a communications system for a proposed port in Weirton, West Virginia on the Ohio River. In February 2009, Tantara abandoned the communications project and advised Kraina that she was no longer needed as a consultant. Kraina and Reed, however, continued to believe the port project was feasible and together developed a business plan for the port project, which they presented to the West Virginia Public Port Authority and regional cities along the Ohio River.

Kraina then entered into a joint venture or partnership with Dickerson, Fellow, Ballas, and Martodam, who were former members of

---

[4]At the oral argument, the parties indicated that, by agreement of the parties, Count XI was dismissed. Accordingly, the discussion below will not address the parties' arguments concerning Count XI, and insomuch as the motions address Count XI, they are denied as moot.

[5]For the purposes of this opinion, this Court adopts, for the most part, the facts as set forth by the plaintiffs in the amended complaint.

Tantara, to begin the planning and construction of the port. Kraina also brought in Breckinridge allegedly to serve as the partnership's corporate attorney. The plaintiffs and original defendants were all designated as part of the board of directors for the partnership, which they agreed to call The American Heartland Port, Inc.

American Heartland Port continued the research, development, and promotion of the port project. Dickerson allegedly lined up funding for the project through Allied Investment PJSC ("AIP") and its executive Patrick DiCarlo.[6] At a presentation with AIP in July 2009, which Kraina believed was to seek funding for American Heartland Port, Dickerson also sought funding for Tetherless Communications, LLC ("Tetherless"). Dickerson asserted that he and Fellows were setting up Tetherless as a successor to Tantara. Thereafter, the plaintiffs believed that Dickerson was attempting to take control of American Heartland Port and work to promote his own company and interests over those of American Heartland Port.[7] Based on the advice of Breckinridge, the plaintiffs incorporated American Heartland Port less than a week after the presentation to AIP.

---

[6]The plaintiffs assert that DiCarlo agreed to obtain funding from AIP if he was given an equity share in American Heartland Port.

[7]The plaintiffs assert that Dickerson attempted to remove them from the board of directors and told them not to incorporate American Heartland Port.

In August 2009, the original defendants resigned from American Heartland Port, and days later incorporated a new company called American Port Holdings, Inc. The plaintiffs assert that after the original defendants formed American Port Holdings, the original defendants misappropriated a feasibility study done by American Heartland Port and contacted many of American Heartland Port's contacts, representing that they were the successor to American Heartland Port.

The plaintiffs then instituted this action, asserting claims arising out of the original defendants' actions in conjunction with the port project. As stated above, on the day before trial was set to begin concerning the plaintiffs' original complaint, the parties notified this Court that they had reached a tentative settlement, and requested that the case be stayed for six months due to uncertainties concerning the settlement. After holding a status conference concerning the tentative settlement, this Court stayed the case pending the outcome of the tentative settlement. The tentative settlement agreement was contingent on certain events occurring. The original defendants, at the time of the tentative settlement discussions, had an agreement of purchase and sale with ArcelorMittal for land owned by ArcelorMittal. Such land was to be used in the port project. The original defendants were in default of the agreement of purchase and sale at the time of the tentative settlement discussions, but ArcelorMittal had agreed to extend the

original defendants time to cure the default so as to allow them to secure funding for the sale. The settlement of this case was dependent upon the sale actually occurring, which would provide the defendants with funds to resolve the claims. Ultimately, the original defendants did not cure their default and ArcelorMittal terminated the agreement of purchase and sale. The plaintiffs then filed an amended complaint, which added additional claims based on alleged actions and events occurring within the months after the parties notified this Court of the tentative settlement.

### III. Applicable Law

Under Rule 56(c) of the Federal Rules of Civil Procedure,

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>      (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials; or
>      (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c). The party seeking summary judgment bears the initial burden of showing the absence of any genuine issues of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). "The burden then shifts to the nonmoving party to come forward with facts sufficient to create a triable issue of fact." Temkin v. Frederick County Comm'rs, 945 F.2d 716, 718 (4th Cir. 1991), cert. denied, 502 U.S. 1095 (1992) (citing Anderson v.

<u>Liberty Lobby, Inc.</u>, 477 U.S. 242, 247-48 (1986)). However, as the United States Supreme Court noted in <u>Anderson</u>, "Rule 56(e) itself provides that a party opposing a properly supported motion for summary judgment may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." <u>Id.</u> at 256. "The inquiry performed is the threshold inquiry of determining whether there is the need for a trial -- whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." <u>Id.</u> at 250; <u>see also</u> <u>Charbonnages de France v. Smith</u>, 597 F.2d 406, 414 (4th Cir. 1979) (Summary judgment "should be granted only in those cases where it is perfectly clear that no issue of fact is involved and inquiry into the facts is not desirable to clarify the application of the law." (citing <u>Stevens v. Howard D. Johnson Co.</u>, 181 F.2d 390, 394 (4th Cir. 1950))).

In <u>Celotex</u>, the Supreme Court stated that "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." <u>Celotex</u>, 477 U.S. at 322. In reviewing the supported underlying facts, all inferences must be viewed in the light most favorable to the party opposing the

11

motion.  See <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986).

## IV.  Discussion

### A.  Count VIII: Tortious Interference Claim

In ArcelorMittal's motion for summary judgment, it argues that it is entitled to summary judgment on Count VIII, which is plaintiffs' claim for tortious interference with the tentative settlement agreement.  In Count VIII, the plaintiffs assert that ArcelorMittal, DiCarlo, and AIP colluded with each other in interfering with plaintiffs' prospective advantage, business relationship, or expectancy with respect to the tentative settlement between the original defendants and the plaintiffs.  The plaintiffs assert that ArcelorMittal, DiCarlo, and AIP dealt among themselves and excluded counsel for the original defendants so as to cause the original defendants to give up all rights and interests in the agreement of purchase and sale.  The plaintiffs assert that the parties did so to benefit DiCarlo and other buyers that were more acceptable to AIP, who was allegedly to provide the funding for the land.

Under West Virginia law, to establish a prima facie case of tortious interference, a plaintiff must prove the following elements: "(1) existence of a contractual or business relationship or expectancy; (2) an intentional act of interference by a party outside that relationship or expectancy; (3) proof that the

interference caused the harm sustained; and (4) damages." Syl. Pt.
2, <u>Torbett v. Wheeling Dollar Savs. & Trust Co.</u>, 314 S.E.2d 166 (W.
Va. 1983).   If a plaintiff establishes these four elements,
however, the defendant "may prove lawful justification or privilege
for its behavior as an affirmative defense."   <u>Id.</u> (citations
omitted).

ArcelorMittal argues that there is no proof of interference,
and even if there was proof, it still had an absolute right to
protect its own contract and property rights.   Further,
ArcelorMittal argues that because the purchase agreement was never
assigned to another buyer, the original defendants' right to buy
the property was never interfered with.   Lastly, ArcelorMittal
asserts that because their actions were not the proximate cause of
the settlement's failure, they cannot be held liable for any
alleged interference.[8]

Initially, this Court notes that after reviewing the evidence
presented by the parties in conjunction with plaintiffs' claim for
tortious interference, this Court finds that such evidence is
insufficient to raise a genuine issue of material fact as to this
claim.  Specifically, this Court finds that the plaintiffs have not
produced sufficient evidence to raise an issue of fact concerning

---

[8]This Court notes that it need not address ArcelorMittal's
proximate cause argument, as ArcelorMittal's other arguments
provide sufficient grounds for this Court to grant summary judgment
for ArcelorMittal as to Count VIII.

the second element of the tortious interference claim. While the plaintiffs may have had an expectancy as to the tentative settlement, there is no evidence that ArcelorMittal intentionally interfered with the tentative settlement. The tentative settlement depended on the original defendants finalizing the agreement for purchase and sale, which the original defendants required funding to accomplish. The evidence indicates that AIP was not going to provide the funding for the defendants, but it does not indicate that ArcelorMittal intentionally interfered with AIP's potential funding. Instead, the evidence only shows that ArcelorMittal was in contact with AIP concerning AIP possibly purchasing the property and restructuring the property purchase accordingly.

Further, as ArcelorMittal stated, the original defendants never assigned their right to AIP to purchase the property. ArcelorMittal and the original defendants had entered into a consent to assign the right to purchase the property. This consent allowed the original defendants to give their right to purchase to AIP. The original defendants, however, never did assign their right to purchase the property to AIP or to anyone else. Therefore, the original defendants' right to purchase the property was never interfered with by the consent to assign provided by ArcelorMittal. Accordingly, any alleged interference claim based on the consent to assign is without merit.

Even assuming the evidence could be construed to show intentional interference on behalf of ArcelorMittal, any interference may be considered justified and would not constitute tortious interference. Under West Virginia law, a defendant may be considered justified in their interference,

> if they show defenses of legitimate competition between plaintiff and themselves, their financial interest in the induced party's business, their responsibility for another's welfare, their intention to influence another's business policies in which they have an interest, their giving of honest, truthful requested advice, or other factors that show the interference was proper.

Id. at syl. pt. 2. If a defendant has a financial interest in the business of a third person and "intentionally causes that person not to enter into a prospective contractual relation with another, [the defendant] does not interfere improperly with the other's relation if he (a) does not employ wrongful means and (b) acts to protect his interest from being prejudiced by the relation." Id. at 171 n.14 (citing Restatement (Second) of Torts, § 769); see also Childers Oil Co., Inc. v. Exxon Corp., No. 1:87-0906, 1991 WL 335998 (S.D. W. Va. June 27, 1991) (recognizing the economic interest privilege and finding that the defendant was justified in refusing to deal with the plaintiff for economic reasons).

Here, it is clear that ArcelorMittal had a financial interest in the purchase of its own property. The plaintiffs, however, argue that ArcelorMittal cannot claim this privilege because their actions were in some way wrongful. This Court finds insufficient

15

evidence to establish that their actions were in fact wrongful. The cited evidence provided by the plaintiffs does not suggest wrongfulness on behalf of ArcelorMittal. Instead, it suggests that ArcelorMittal was interested in selling its property. It does not suggest that ArcelorMittal had any preference as to what entity purchase the property, whether it be AIP or the original defendants. Accordingly, this Court finds that whether or not there was interference on behalf of ArcelorMittal with the tentative settlement, any interference was justified to protect its financial interest in selling its property.

B.    Count IX: Good Faith Claim

Count IX is the plaintiffs' claim that the original defendants violated the doctrine of good faith and fair dealing in working with others to sabotage the settlement agreement. The original defendants argue that this Court must grant them summary judgment as to this count because West Virginia does not provide for such a cause of action. Further, they argue that if this count is construed as a contract claim, it still must fail because no contract existed between the parties and the original defendants owed no duty to the plaintiffs. The plaintiffs, in response, argue that there was an enforceable settlement agreement and the parties were entitled to rely on the good faith and fair dealing of the other parties to perform the settlement agreement.

Initially, this Court finds that the plaintiffs' claim for breach of the doctrine of good faith and fair dealing cannot survive as a separate cause of action. West Virginia law recognizes that "'in every contract there exists an implied covenant of good faith and fair dealing.'" Burbach Broad. Co. of Delaware v. Elkins Radio Corp., 278 F.3d 401, 409 (4th Cir. 2002) (quoting Harless v. First National Bank in Fairmont, 246 S.E.2d 270, 274 (W. Va. 1978)). West Virginia law does not, however, recognize an independent cause of action for the breach of an implied covenant of good faith and fair dealing separate and apart from a breach of contract claim. Stand Energy Corp. v. Columbia Gas Transmission Corp., 373 F. Supp. 2d 631, 644 (S.D. W. Va. 2005); see also Warden v. PHH Mortg. Corp., No. 3:10-cv-75, 2010 WL 3720128, at *5 (N.D. W. Va. Sept. 16, 2010). Therefore, if Count VIII were to survive summary judgment, it must be construed as a breach of contract claim.

If Count VIII were construed as a breach of contract claim, however, this Court still must grant the original defendants' summary judgment motion as to this count because the tentative settlement was not an enforceable contract that could be breached. Generally, settlement agreements are treated "as any other contract" under West Virginia law. Burdette v. Burdette Realty Improvement, Inc., 590 S.E.2d 641, 645 (W. Va. 2003) (citations omitted). To state a breach of contract claim under West Virginia

17

law, a plaintiff must show: (1) existence of a valid enforceable contract; (2) plaintiff performed under the contract; (3) defendant breached or violated a duty under the contract; and (4) the plaintiff was injured by this breach. Wince v. Easterbrooke Cellular Corp., 681 F. Supp. 2d 688, 693 (N.D. W. Va. 2010).

At issue, is whether a valid enforceable contract existed. The requirements for a valid enforceable contract "are competent parties, legal subject-matter, valuable consideration, and mutual assent. There can be no contract, if there is one of these essential elements upon which the minds of the parties are not in agreement." Syl. pt. 5, Virginian Export Coal Co. v. Rowland Land Co., 131 S.E. 253 (1926); see also Ways v. Imation Enterprises Corp., 589 S.E.2d 36, 44 (2003). The West Virginia Supreme Court of Appeals has stated that as to settlement agreements, "a definite meeting of the minds of the parties is essential to a valid compromise, since a settlement cannot be predicated on equivocal actions of the parties." Burdette, 590 S.E.2d at 645 (citations and internal quotations omitted).

Further, the court cautioned that "care should be taken not to construe as an agreement that which the parties only intended to be a preliminary negotiation." Blair v. Dickinson, 54 S.E.2d 828, 844 (W. Va. 2004). In cases where a formal agreement has not been entered into, the court in Blair stated that the question is: "Did the parties mean to contract by the memorandum of agreement, or

were they only settling the terms of an agreement into which they proposed to enter after all its particulars were adjusted, which was then to be formally drawn up, and by which alone they designed to be bound?" Id. When the parties intend to reduce the terms of settlement negotiations to writing before approval by all parties, there is no enforceable settlement agreement until the parties take such action. Sprout v. Board of Educ. of County of Harrison, 599 S.E.2d 764, 768 (W. Va. 2004).

While a tentative settlement agreement between the parties may have been reached in October 2012, a valid enforceable contract in the form of a final settlement agreement does not exist, as there was no meeting of the minds concerning the final agreement. Based on the evidence, the parties had only agreed to the value of the plaintiffs' claims. The parties represented that no final agreement as to the other terms, such as the term concerning the payment of the settlement had been reached. See ECF No. 350 Ex. 3 *4. Further, as to the payment conditions, the plaintiffs represented that if the parties could not come to an agreement concerning the payment, the parties would proceed to trial. Id. Accordingly, it is clear that further negotiations and discussions needed to occur before a final agreement was reached. Also, the finalization of the settlement depended on the original defendants obtaining the funding and completing the purchase agreement with ArcelorMittal. This condition never occurred and thus, it cannot

be said that there was mutual assent as to any final enforceable agreement. Therefore, even construing Count IX as a breach of contract claim, this Court still must dismiss the claim because no enforceable contract exists that the original defendants could have breached.

C.  Count X: WVUFTA Claim

Both ArcelorMittal and the original defendants argue that Count X must be dismissed. Count X is plaintiffs' claim under the WVUFTA, in which they allege that the original defendants entered into a consent to assign the purchase agreement with ArcelorMittal without having received a reasonably equivalent value for it. The plaintiffs assert the intent of the original defendants and ArcelorMittal in entering in the consent to assign was to facilitate a sale of the property to AIP while hindering, delaying, or defrauding the plaintiffs with respect to their claim against the original defendants. The plaintiffs claim that the original defendants are liable as principals and that the ArcelorMittal is liable under a theory of accomplice liability.[9]

The original defendants argue that summary judgment must be granted in their favor as to this claim because the WVUFTA is not applicable to this case. They assert that the plaintiffs are not the creditors of the original defendants because they had no

---

[9]While this is not made clear in the plaintiffs' complaint, it was confirmed by the plaintiffs during oral argument concerning the defendants' motions for summary judgment.

expectation of or right to payment of the tentative settlement. ArcelorMittal agrees with this assertion. Further, ArcelorMittal argues that summary judgment must also be granted as to this claim because there was no transfer of any property right because there was no actual assignment of the original defendants' rights under the purchase agreement to AIP. Instead, the original defendants and ArcelorMittal only entered into a consent to assign. In the alternative, however, ArcelorMittal asserts that even if there could be said to be some transfer of a property right, ArcelorMittal cannot be liable as an accomplice because West Virginia does not recognize a claim for aiding and abetting a fraudulent transfer.

First, assuming without deciding that the plaintiffs are somehow the creditors of the original defendants, this Court finds that the WVUFTA claim must be dismissed because there is insufficient evidence of a transfer of any asset or interest in an asset covered by the WVUFTA. The WVUFTA "makes transfers by debtors 'fraudulent if made under certain circumstances.'" Nicholas Loan & Mortg., Inc. v. W. Va. Coal Co-Op, Inc., 547 S.E.2d 234, 239 (W. Va. 2001) (quoting Rich v. Rich, 405 S.E.2d 858, 860 (W. Va. 1991)). The WVUFTA provides the following definition of "transfer:"

> "Transfer" means every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset, and

includes payment of money, release, lease and creation of a lien or other encumbrance.

W. Va. Code § 40-1A-1(l).

In this case, the parties never completed a transfer of an asset or an interest in an asset covered by the WVUFTA. In their complaint, the plaintiffs assert that the consent to assignment was entered into fraudulently and a reasonably equivalent value was not given for the consent. Thus, it appears that they are arguing that the consent to assign was the fraudulently transferred asset. This argument is without merit. First, the consent to assign was provided by ArcelorMittal to the original defendants; it was not transferred from the original defendants to ArcelorMittal or any other party. Thus, even assuming that the original defendants are debtors to the plaintiffs, and the plaintiffs are the original defendants' creditors, the debtors did not fraudulently transfer the consent to assign because the consent was not theirs to give. Second, if the plaintiffs are arguing that the assignment of the purchase agreement was the asset fraudulently transferred, this argument also fails. The purchase agreement was never actually assigned to any party, including AIP. Instead, the purchase agreement between ArcelorMittal and the original defendants was eventually terminated due to the original defendants' inability to acquire funding to complete the purchase.

In their response to the defendants' motions for summary judgment, the plaintiffs attempt to argue that their fraudulent

conveyance claim is broader than the consent to assign. The plaintiffs assert that the original defendants constructively transferred the entire value of their assets, including the contract for the real estate and the value of their intellectual and proprietary rights to AIP. Thus, the plaintiffs are arguing that their fraudulent transfer claim involves more than the consent to assignment. This new assertion, however, is not the claim raised in the plaintiffs' amended complaint. The plaintiffs' amended complaint only speaks of the consent to assign and does not speak of any intellectual or proprietary rights allegedly transferred by the original defendants. The plaintiffs cannot use these new allegations to defeat the defendants' motions for summary judgment, as "it is well established that a plaintiff may not raise new claims after discovery has begun without amending [the] complaint." <u>United States ex rel. Owens v. First Kuwaiti General Trading & Contracting Co.</u>, 612 F.3d 724, 731 (4th Cir. 2010).

As to plaintiffs' claim under a theory of accomplice liability, any such claim must fail because, as stated above, there was no transfer on which to base accomplice liability. Further, while the West Virginia Supreme Court of Appeals has not addressed whether the WVUFTA covers claims for accomplice liability, there is no provision in the statute providing for such cause of action. Many other courts considering the question of accomplice liability have found that the Uniform Fraudulent Transfer Acts in their

23

states do not cover such claims.  See <u>Magten Asset Mgmt. Corp. v.</u>
<u>Paul Hastings Janofsky & Walker LLP</u>, No. Civ.A.04-1256-JJF, 2007 WL
129003, at *3 (D. Del. Jan. 12, 2007) (citing cases from other
states finding that their Uniform Fraudulent Transfer Acts do not
cover claims for aiding and abetting).  Accordingly, it is likely
that the WVUFTA, which is based on the same uniform law as the
other states' statutes, also does not cover such claims.
Nevertheless, this Court need not attempt to make any such
definitive determination, as the claim for accomplice liability
fails for the initial reason that there was no transfer of an asset
or interest in an asset on which to base such liability.

## V.  <u>Conclusion</u>

For the reasons stated above, the original defendants' partial
motion for summary judgment is GRANTED, and ArcelorMittal's motion
for summary judgment is GRANTED.  Further, all pending motions in
limine filed by ArcelorMittal are hereby DENIED AS MOOT.

IT IS SO ORDERED.

The Clerk is DIRECTED to transmit a copy of this memorandum
opinion and order to counsel of record herein.  Pursuant to Federal
Rule of Civil Procedure 58, the Clerk is DIRECTED to enter judgment
on this matter as to all claims against defendant ArcelorMittal.

DATED:     July 17, 2014


/s/ Frederick P. Stamp, Jr.
FREDERICK P. STAMP, JR.
UNITED STATES DISTRICT JUDGE